UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYNTHIA HART,

Plaintiff,

v.

PAUL COLLINS, ET AL.,

Defendants.

_____/

Case No. 20-cv-13324

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

## OPINION AND ORDER: (1) GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT BY DETECTIVE COLLINS AND CLINTON TOWNSHIP [ECF No. 35]; AND (2) GRANTING MOTION FOR SUMMARY JUDGMENT BY MACOMB COUNTY [ECF No. 36] AND RESETTING SCHEDULING ORDER DATES.

## I.     Introduction

Plaintiff Cynthia Hart ("Hart") brings this lawsuit under 42 U.S.C. § 1983. She asserts a Fourth Amendment claim (Count I) and a state law claim for gross negligence (Count II) against Clinton Township Police Detective Paul Collins ("Detective Collins") in his individual and official capacities. She also asserts *Monell* claims (Count III) against Macomb County and the Charter Township of Clinton ("Clinton Township").

Before the Court are two motions: Detective Collins' and Clinton Township's motion for summary judgment [ECF No. 35] and Macomb County's independent

1

motion for summary judgment [ECF No. 36]. These motions are fully briefed and the Court heard oral argument on November 14, 2022.

For the reasons stated below, the Court **GRANTS** Defendant Macomb County's motion [ECF No. 36].

It is further ordered that the Court **GRANTS** in part and **DENIES** in part Clinton Township and Detective Collins' motion [ECF No. 35].

Clinton Township and Macomb County are **DISMISSED** from this case on summary judgment grounds.

## I.    Factual Background

Hart's Fourth Amendment and state law claims arise out of the conduct of Detective Collins, who investigated Hart, submitted a case report, and ultimately requested a warrant for her arrest in July 2019. Assistant Prosecuting Attorney Steven Fox approved the Warrant Authorization, a magistrate judge signed it, and on July 30, 2019, Cynthia Hart was charged with two counts of "Intent to Pass False Title" under the Michigan Vehicle Code ("MCL 257.254"). However, On November 6, 2019, Fox received a letter from Hart's attorney that led him to drop the criminal charges against Hart after determining insufficient probable cause existed to move forward to a jury trial.

The relevant factual background pertains to the most important issue in this case: whether, under the totality of the circumstances, a reasonable officer in Detective Collins' position would have believed he had probable cause to arrest Hart for two counts of intent to pass false title. Importantly, however, all the details that Detective Collins included in and omitted from the warrant request and case report are relevant to Hart's Fourth Amendment claim as well.

On March 22, 2019, Sandra McPherson ("Sandra") went to the Clinton Township Police Department and reported that her 2002 Chevrolet Avalanche ("the vehicle") had been stolen. Sandra told police that her husband Wayne McPherson ("Wayne") previously allowed their son Brian McPherson ("Brian") to use the vehicle. Wayne died in 2010, after which Sandra claims to have placed the title of the vehicle in Sandra's name, but she allowed Brian to continue using the car for several years because he needed transportation and had health issues. [ECF No. 35-2. PageID.223]. Sandra allegedly told police that she asked Brian about the vehicle, and he told her that he sold it. [Id].

Sandra's complaint triggered a criminal investigation that was assigned to Detective Collins, a Clinton Township police detective assigned to the Macomb Auto Theft Squad ("MATS").

On April 8, 2019, Detective Collins called Sandra by phone. She informed him that she could not figure out how Brian sold the vehicle because she had the original title and never gave him ownership. [Id]. She also told Detective Collins that Brian lived with a woman name Cynthia Hart. [Id].

Cynthia Hart is the Plaintiff in this case and was Brian's long-time girlfriend before he died on April 23, 2019, due to health complications. Although they were not legally married, Hart testified that they held themselves out as husband and wife and had lived together since 1998. She also testified that Sandra, being Brian's mother, would refer to her as "daughter in law." [ECF No. 40, PageID.716]. Contrary to Sandra's police report, Hart claims that Wayne gave the vehicle (which was registered in Wayne's name) to Brian for indefinite use while they were both alive. After Wayne died Sandra registered the vehicle in her name and claimed that she only intended to lend Brian the vehicle for temporary use. [ECF No. 40-2, PageID.753].

On April 15, 2019, Detective Collins ran the vehicle's title history with the secretary of state and found that it was currently registered to a third party. This is because, on October 23, 2017, Hart sold the vehicle to a car dealership named Buff Whelan Chevrolet. That dealership then sold the vehicle to a third party. It also showed that Sandra signed the title of the vehicle over to Hart on July 5, 2017. [Id]. On the same day, Hart applied for a title in her own name and stated "TAX EXEMPTION" for receiving the vehicle from her mother-in-law.  [Id]. Hart says she told Collins that, even though her and Brian were not married, she did this because she believed at the time that Michigan recognized the common law marriage.

On May 14, 2019, Detective Collins interviewed Sandra; she told him again that she had the original title and allowed Brian to use the vehicle but never intended to give it to him indefinitely. [ECF No. 35-2, PageID.223-24]. She also said that Hart was not her daughter in law. [Id].

On June 28, 2019, Detective Collins called Hart. He claims he asked Hart about the vehicle and she "immediately became defensive and tried to change the focus of the conversation to money problems she had with her boyfriend (Brain Walker/victim's son) who recently passed away." [ECF No. 35-2, PageID.223]. He said Hart told him that "Hart transferred the vehicle from Brian to herself prior to

selling the vehicle to Buff Whalen." [Id]. He noted that the vehicle was never titled to Brian, although Hart apparently thought that it was.

Hart stated that she told Detective Collins that although Wayne gave the vehicle to Brian for him to keep, after Wayne's death, there was no life insurance money to bury him, so Brian and Sandra agreed that Brian would make payments to her in the amount of $10,000. [40-2, PageID.783-785].

Detective Collins claims that "[Hart] attempted several times during the conversation to change the subject from the vehicle to civil matters that had nothing to do with the aforementioned vehicle." [ECF No. 35-2, PageID.223]. He says he continually requested that Hart stay on the topic of the vehicle and requested for her to meet him at the Clinton Township Police Department on July 3, 2019 to speak to her in person. [Id].

Hart testified that she informed Detective Collins about how the relationship between Sandra and Brian had deteriorated and that Sandra was "confused" and possibly had "dementia." [40-2, PageID.784]. He responded, "that's neither here nor there." [ECF No.  40-2, PageID.776]. Hart also says she told him about family dynamics related to an allegedly "fraudulent" lawsuit in 2017 that Sandra filed against her then live-in partner Russell Gray. [Id]. In that lawsuit Hart sided with

Gray. [Id]. Hart told Detective Collins to call the judge in the state court case to verify it. [Id]. Detective Collins denies being told any of this information.

During the conversation, Hart allegedly told Detective Collins that she would meet him and bring any documentation which showed her ownership and payment for the vehicle. [Id]. Hart did not show up for the meeting, but she advised Detective Collins via phone that she retained an attorney, John Tatone.

Detective Collins spoke with Tatone via phone on July 4, 2019. Tatone explained that he had documentation to give Detective Collins. Detective Collins claims that Tatone sent him an email with documents showing that Hart paid Sandra money in the past, "but nothing showing those payments were going towards the aforementioned vehicle." [Id]. Hart claims the documents show payment of money for the vehicle. Detective Collins allegedly responded to Tatone by requesting any documents showing a sale of the vehicle or payments made for the 2002 Avalanche.

Tatone claimed in an affidavit that on July 4, 2019, he told Detective Collins about the lawsuit between Sandra and Gray, that Sandra was suffering from "confusion and dementia," and that her report was "nothing more than an act of revenge against Hart" since Hart and Brian had attended a facilitation in that case and had sided with Gray. [ECF No. 41-5, PageID.881]. Tatone allegedly asked Detective Collins if he could reschedule the meeting with him because Tatone was

on vacation and could not be present on the day that Detective Collins requested. [Id]. Tatone opined that Detective Collins was "very angry" that he would not permit Hart to meet with Detective Collins without Tatone being present. [Id].

When Detective Collins found out the Hart would not be appearing for their meeting, he allegedly contacted her directly. [ECF No. 40-2, PageID.785].  She informed him that, on advice of her attorney, she would not meet him without Tatone present. [Id]. Detective Collins responded: "you left me no choice but to have a warrant for your arrest issued." [Id].

Detective Collins warrant request stated that "Cynthia Hart used an 'Appointment of Agent' form from the Secretary of State office . . . with a copy of Sandra's driver license to obtain fraudulent duplicate title . . . Cynthia used the fraudulent duplicate title[,] . . . forged Sandra's signature on the title[,] then transferred the [vehicle] into Cynthia's name." [ECF No. 40-11, PageID.851]. The warrant request also claims that Hart passed false title when she sold the vehicle to Buff Whalen. [Id]. Detective Collins submitted these statements despite the fact that the Michigan SOS Application for Vehicle title shows there was no appointment of agent form, and Sandra obtained a duplicate title with her own state identification and paid for it with her own bank card [ECF No. 40-6, PageID.802]. The statements in Detective Collins' warrant request were relied on by the prosecutor to approve the warrant and initiate criminal proceedings.

The Court will now discuss whether Detective Collins is entitled to qualified immunity or governmental immunity under Michigan law on any of the counts in Hart's complaint.

## II.    Applicable Law and Analysis

### A. Summary Judgement Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

To determine whether a genuine dispute of material fact exists the Court does not weight the evidence, it "draw[s] all reasonable inferences and view[s] the evidence in the light most favorable to the [nonmovant]". *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013).

## B. Qualified Immunity Standard

Qualified immunity shields state and local officials from personal liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

In reviewing a claim for qualified immunity, the Court considers: (1) whether the plaintiff has asserted a violation of a constitutional right; and (2) whether the constitutional right was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights. *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006). In determining whether a constitutional right was "clearly established" the plaintiff bears the burden of showing that "existing precedent [has] placed the [. . .] constitutional question beyond debate," but the existing precedent need not be factually on-point. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

10

For purposes of qualified immunity, officials can still be on notice that their conduct violates established law even in novel factual circumstances, as notice does not require that facts of previous cases be materially or fundamentally similar to the situation in question; rather, the salient question is whether the state of the law at the time gives officials "fair warning" that their conduct is unconstitutional. *Hope*, 536 U.S. at 741.

"[The] court should not grant summary judgment... if there exists a genuine issue of material fact, 'involving an issue on which the question of [qualified] immunity turns.'" *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 346 (6th Cir. 2001) (*quoting Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir. 1988)).

### C. Count I: Hart's False Arrest and Malicious Prosecution claim.

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake,* 412 F.3d 669, 677 (6th Cir. 2005).

Similarly, one of the elements of a malicious-prosecution claim—and the most relevant one here—is that a plaintiff must show that the officers helped initiate a prosecution against her "without probable cause." *Howse v. Hodous,* 953 F.3d 402, 408 (6th Cir. 2020). A prima facie claim for malicious prosecution also requires that: "as a consequence of the legal proceeding, the plaintiff suffered a deprivation of

liberty apart from the initial seizure; and the criminal proceeding was resolved in the plaintiff's favor." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015).

There is no dispute that Detective Collins' warrant request helped initiate criminal proceedings, that those proceedings were resolved in Hart's favor, and that she was arrested and prosecuted, thereby suffering a deprivation of liberty. Hart also testified about the physical and emotional harm she experienced after she was arrested and prosecuted.

The decisive question for Hart's Fourth Amendment claims is whether a reasonable officer in Detective Collins position would believe that he had probable cause to arrest Hart on two counts of "Intent to Pass False Title" under Michigan's Motor Vehicle Code, MCL 257.254 and whether he made statements with reckless disregard for the truth in his warrant application.

### i. Constitutional Violation: Lack of Probable Cause

Detective Collins argues that there was probable cause for a reasonable officer to suspect that the Plaintiff had violated MCL 257.254 ("any person who knowingly makes a false statement of a material fact, in their application for a certificate of title is guilty of a felony").

For probable cause to exist, the "facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (citation and internal quotation marks omitted). The inquiry focuses on the information available to the officer at the time of the arrest without the benefit of 20/20 hindsight vision. *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (internal citations and quotation marks omitted).

The issuance of an arrest warrant will not shield the police officer who applied for the warrant from liability for false arrest if "a reasonably well-trained officer in [his] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Gregory v. City of Louisville*, 444 F.3d 725, 747 (6th Cir. 2006) (*citing Malley v. Briggs*, 475 U.S. 335, 345 (1986)).

When an arrest is made pursuant to a facially valid warrant, to prevail on a false-arrest claim, the plaintiff must prove that, in order to procure probable cause, the defendant "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood." *Sykes v. Anderson*,

625 F.3d 294, 305 (6th Cir. 2010). A plaintiff must also show that "such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Id*.

Viewing the facts in the light most favorable to Hart, a reasonable jury could conclude that Detective Collins did not have probable cause to arrest Hart. It could also find that he made deliberate omissions in his warrant request and case report that created a falsehood material to the finding of probable cause.

Detective Collins' warrant request and case report states that Hart fraudulently obtained a duplicate title by forging Sandra's signature, using her state identification, and obtaining an appointment of agent form. The Michigan SOS Application for Vehicle title shows that there was no appointment of agent form and that Sandra obtained a duplicate title with her own state identification and paid for it with her own bank card. [ECF No. 40-6, PageID.802].

This evidence is exculpatory because it could show that Sandra obtained the duplicate title, not Hart, which would destroy any probable cause for Hart's arrest and prosecution. Detective Collins' discovery of these facts should have been incident to his normal investigation; it was necessary for him to inquire into who paid for the duplicate title and whether an appointment of agent form was used. But he omitted these facts from the warrant request.

Further, Detective Collins fails to consider any of the details Hart and Tatone shared with him regarding: (1) the allegedly disingenuous and vindictive motivation for Sandra's complaint that her vehicle was stolen, and (2) the state of Sandra's mental health, possible dementia, and confusion. Hart testified that when she told Detective Collins about Sandra's mental state, he said "that's neither here nor there." [ECF No. 40-2, PageID.776].

And Detective Collins did not attempt to speak to Sandra's former live in partner Russell Gray, who could also testify that he accompanied Sandra to the secretary of state on the day that she obtained the duplicate title. [ECF No. 35-5, PageID.271-273]. Hart told Detective Collins that Gray and Sandra were involved on opposite sides of an allegedly fraudulent lawsuit Sandra filed against Gray, which Hart claims played a role in Sandra's allegedly "vindictive" motivation to report her vehicle stolen. All of this is exculpatory evidence that Detective Collins may have deliberately omitted from his warrant request. It is a question for the jury to decide.

Detective Collins testified that the above information would have been pertinent to his probable cause analysis if he had been aware of it before requesting the warrant. [ECF No. 40-8, PageID.819, 820]. Indeed, all these facts were listed in the letter sent to the prosecutor that resulted in him dropping the charges for lack of probable cause. See [ECF No. 35-5, PageID.271-273].

It is true that the probable cause analysis considers information available to the officer at the time of the arrest. But even if Detective Collins was unaware of the specific details of the exculpatory evidence at the time of his warrant request, Hart testified that she shared these details with him. She says he would not hear them. But Detective Collins nonetheless submitted a warrant request alleging that Hart fraudulently obtained duplicate title to Sandra's vehicle using an appointment of agent form; a fact that is contradicted by evidence available to Detective Collins but that he unreasonably failed to investigate at the time of the warrant request.

Detective Collins' failure to consider exculpatory evidence and Hart's explanation for Sandra's questionable accusations that her son stole her car could lead a jury to find that Detective Collins violated Hart's Fourth Amendment rights against false arrest and malicious prosecution. *See Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 281 (6th Cir. 2020) (holding that city police officer—who arrested plaintiff based on a dubious accusation of her ex-husband claiming that she was the aggressor during a domestic disturbance—was required to consider version of events set forth by arrestee and eyewitness when assessing probable cause).

There is a genuine dispute of material fact regarding whether Detective Collins was aware of this exculpatory evidence before he requested the warrant and

whether he deliberately omitted it from the warrant request in order to justify probable cause.

Two other genuine issues of material fact remain: (1) whether a reasonable officer under Detective Collins' circumstances would have investigated the exculpatory evidence available to him before making an arrest; and (2) whether the statements in the warrant request contain material omissions or were made with reckless disregard for the truth. At minimum, there is a genuine issue of material fact regarding whether Detective Collins' belief that probable cause existed was based on reasonably reliable information considering the details Tatone and Hart shared with him.

Hart has established that she could succeed on her Fourth Amendment claim at trial. The Court will discuss whether this right was clearly established in July 2019 at the time of Hart's arrest.

### ii.   Hart's Fourth Amendment Rights Were Clearly Established by the Time of Her Arrest.

Viewing the facts in the light most favorable to Hart, Detective Collins had fair warning that his conduct violated Hart's Fourth Amendment rights against false arrest and malicious prosecution in July 2019.

This conclusion is borne out by Sixth Circuit precedent in 2000 ruling that a police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime. *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). In obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. *Id*. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest. *Id.*

The Officers in *Gardenhire* had the following information about the plaintiffs before the arrest: that a victim claimed that several items from her store were missing, and that these items were visible in the store-front windows of the adjacent store owned by plaintiff. *Gardenhire*, 205 F.3d at 317. The Court ruled that there was enough evidence to authorize the police to ask the plaintiffs if the items belonged to them, to inquire as to why the items were in their store, and to gather information about the relationship between victim and Plaintiff. *Id*. But, in the Court's view, the victim's mere allegation that she owned the items in plaintiffs' storefront was not enough to justify an arrest. Further investigation was necessary at that point. *Id*. The Court found that if the officers had asked further questions, they would have learned that plaintiff and victim shared the facilities of both stores and were in the process of trading store fronts. *Id*. Such information would lead a

reasonable officer to consider that something other than a theft—such as misplacement or a simple misunderstanding—had occurred. *Id*.

The same is true for Detective Collins. Sandra told Detective Collins that she did not give her son Brian ownership of the vehicle nor permission to sell it. Sandra told Detective Collins that she did not know how the Vehicle could have been sold since she held the original title. Sandra informed Detective Collins that the signature on the duplicate title was not her signature and that she never signed it. Sandra provided the actual physical original title to Detective Collins. The Secretary of State told Detective Collins that the only way to get a duplicate title would be through an Appointment of Agent form. Defendants say Detective Collins' statement that the Plaintiff used an Appointment of Agent form was not a deliberate falsehood. Instead, this statement was simply based on the evidence that Detective Collins had before him including Sandra's affirmative statements that she did not sign the Duplicate Title.

Similar to the items in *Gardenhire* that were reported stolen and found in the plaintiffs' storefront, none of the evidence that Detective Collins relies on points to Hart as the forger of Sandra's signature besides the fact that the duplicate title was in her name. The officer in *Gardenhire* failed to reasonably formulate probable cause

pursuant to his deficient investigation and Detective Collins has likely done the same here.

Further investigation would have yielded exculpatory evidence: that Sandra paid for the duplicate title using her own bank card, that she was confused about the situation regarding the vehicle, that there was no appointment of agent form, and that Grey accompanied Sandra to the SOS on the day she obtained duplicate title. Further, if Detective Collins had listened to Hart's side of the story it would have revealed an explanation for Hart's contention that she was Sandra's daughter in law and that the vehicle was in Brian's name.

A jury could conclude that a reasonable officer would have engaged in further investigation when he knows that payment, state identification, and an appointment of agent form was required to obtain duplicate title. And no evidence suggested that it was Hart who used these items to obtain duplicate title. Further, any reasonable officer would have investigated Hart's claims that Sandra had dementia, the familial drama, and alleged vindictiveness at play between Sandra, Brian, Gray, Hart, and the stolen vehicle report.

In *Logsdon v. Hains,* 492 F.3d 334, 343 (6th Cir. 2007), the Sixth Circuit applied the *Gardernhire* holding. The defendant officers arrested plaintiff for trespass and disorderly conduct based on the single eyewitness allegation, and

"refused to listen to a witness's account of the incident, admonishing her to 'Tell it to the judge.'" *Id*. The Sixth Circuit reversed the district court's grant of qualified immunity to the officers, finding that they unreasonably "turn[ed] a blind eye" to potentially exculpatory evidence when they refused to listen to the witness' "attempted explanation" of the incident. *Id*. at 342. The Court ruled that, "[e]ven assuming that [the witness] constitutes a 'reliable source' here, Defendants deliberately disregarded available evidence and, consequently, failed to reasonably formulate probable cause." *Id*.

The same can be said here about Detective Collins' refusal to listen to or consider Hart and Gray's explanation of the events, which would have suggested that something other than title fraud was at work—such as confusion, a misunderstanding, or revenge. And he failed to inquire into whether Sandra paid for the duplicate title with her bank card and whether there was an appointment of agent form, even though he undisputedly knew that one was necessary to obtain duplicate title. In fact, when the prosecutor became aware of the information that Hart says she tried to tell Collins, and after he heard from Gray, he dropped the charges for lack of probable cause.

Hart says that Detective Collins knew or should have known of these facts based on the information she shared with him. Because Detective Collins omitted

this information from the warrant, there is a genuine issue of material fact regarding whether these omissions were deliberate and whether the statements in Detective Collins' warrant request were made with reckless disregard for the truth.

These fact questions, paired with *Gardenhire*, *Lodgson*, and the Sixth Circuit's 2010 holding in *Sykes v. Anderson,* 625 F.3d 294 (6th Cir. 2010)—which clearly established that probable cause was lacking at the time a police officer submitted an arrest warrant application because the warrant contained the officer's deliberate material misrepresentations and omissions—requires the Court to conclude that Detective Collins had fair waring that his conduct would violate Hart's clearly established Fourth Amendment rights in July of 2019.

The Sixth Circuit has also held that alleging probable cause for prosecution based upon an officer having "fabricated evidence and manufactured probable cause" is sufficient to state a claim of malicious prosecution under the Fourth Amendment. *See Spurlock v. Satterfield*, 167 F.3d 995, 1005–06 (6th Cir.1999). A reasonable jury could conclude that Detective Collins stated certain facts in the warrant application and omitted exculpatory evidence in order to manufacture probable cause.

As the Supreme Court noted in *Hope v. Pelzer*, an action's unlawfulness "can be apparent from direct holdings, from specific examples described as prohibited, or

from the general reasoning that a court employs." *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015) (*citing Hope*, 536 U.S. at 742–44). Moreover, this Court does not require "a prior, precise situation, a finding that the very action in question has previously been held unlawful, or a case directly on point" to hold that a right was clearly established. *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (quotations omitted).

### D. Count II: Hart's Gross Negligence Claim

Count II of Hart's complaint asserts a gross negligence claim. Under the Michigan Government Tort Liability Act, government employees are immune from tort liability for injury caused by the employee while in the course of employment if the officer reasonably believed he was acting within the scope of his authority and he was not grossly negligent. M.C.L § 691.1407. Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L § 691.1407(7)(a); *McGuire v. City of Royal Oak*, 295 F. App'x 736, 739 (6th Cir. 2008).

In *McGuire v. City of Royal Oak*, 295 F. App'x 736, 739–40 (6th Cir. 2008), the Sixth Circuit, applying Michigan law, held that there was ample evidence that two officers acted with gross negligence in furthering their prosecution based on witnesses interviewed by officers because those witnesses did not know the identity

23

of the assailants and yet repeatedly testified that plaintiffs were the assailants. The Court concluded that the facts, viewed in the light most favorable to plaintiffs, clearly suggests that officer demonstrated "a substantial lack of concern for whether an injury [would] result[ ]."

*McGuire* is analogous for the same reasons stated above. Detective Collins knew or should've known that no appointment of agent form was used, that Sandra paid for the duplicate title herself, that Sandra potentially had dementia, she was confused about her car being stolen and whether she was the one who obtained duplicate title, and family drama. Despite all this exculpatory evidence, Detective Collins obtained an arrest warrant by falsely stating that Hart used an appointment of agent form to obtain duplicate title. And he stated, without any evidence or regard for truthfulness, that Hart forged Sandra's signature, and used a copy of Sandra's state identification. A simple investigation into the information Hart and Tatone shared with Detective Collins would have destroyed probable cause because there was evidence showing that these allegations were not true.

A jury could conclude that, in making the statements in the warrant request, Detective Collins demonstrated a substantial lack of concern for whether an injury would result.

### E. Count III: Hart's *Monell* Claims Against Clinton Township and Macomb County

Hart claims Clinton Township and Macomb County acted with deliberate indifference to the obvious and/or known risks to her rights. [ECF No. 1, PageID.11]. According to her complaint these acts include: (1) failing to adequately and appropriately train and supervise their employees; (2) failing to supervise, review, and/or discipline employees whom Defendants knew or should have known were violating or were prone to violate citizens' constitutional rights, thereby permitting and/or encouraging its employees to engage in illegal conduct; and (3) failing to require its employees to comply with established policies and/or procedures and discipline or reprimand employees who violated these established polices. [Id].

"A municipality may not be held liable under § 1983 on a respondeat superior theory—in other words, 'solely because it employs a tortfeasor.' " *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (*quoting Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978). Instead, a plaintiff must show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (*quoting Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). A plaintiff does this by showing that the municipality had a "policy or custom" that caused the violation of her rights. *Monell*, 436 U.S. at 694. And when a plaintiff seeks to hold a municipality liable

based on a facially lawful municipal action which led an employee to violate her rights, she "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 580–81 (6th Cir. 2020)

There are four methods of proving a municipality's illegal policy or custom. The plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (*citing Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

At issue here is the third method. To show the existence of a policy of inadequate training or supervision, a plaintiff must prove: (1) the training or supervision was inadequate for the tasks performed; (2) that the inadequacy was the result of the municipality's deliberate indifference; and (3) that the inadequacy was closely related to or actually caused the injury. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700-701 (6th Cir. 2006). A municipality's failure to provide adequate training considering foreseeable consequences that could result

from a lack of instruction or supervision could constitute deliberate indifference sufficient for § 1983 municipal liability. *Id*. at 701.

"Deliberate indifference" to a plaintiff's rights is a stringent standard of fault, requiring proof that municipal actor "disregarded known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Plaintiffs argue that the training of both Clinton Township and Macomb County were inadequate because Detective Collins testified that he never received any training regarding what he would be doing in MATS and he never was trained in title fraud investigation.

Macomb County argues that Detective Collins is employed by Clinton Township and that it does not supervise the officer in the MATS task force. Those officers are supervised by the local police agencies employing the task force members. [ECF No. 36, PageID.582].

Even if Detective Collins was an employee of Macomb County, Hart cannot show a failure to train amounting to deliberate indifference by Macomb County or Clinton Township. Macomb County claims that MATS did provide newly assigned police officers, including Detective Collins, with training appropriate for tasks performed by officers investigating auto related crimes. Further, Macomb County

Detective Sergeant Hanna claimed in an affidavit that, in 2019, the first year Detective Collins was assigned to MATS, it sent him to the following training classes in: covert surveillance; auto theft; and criminal interview & interrogation. [ECF No. 36-3, PageID.641]. Detective Collins also testified that he was a graduate of the Detroit Police Academy. [ECF No. 36-2, PageID.595].

Hart advances no evidence showing that training programs of Macomb County or Clinton Township were flawed or that they failed to address aspects of the job that Detective Collins was unaware of but would foreseeably need to know in order to avoid constitutional violations.

Although Detective Collins did not have specific training on the narrow issues of title fraud, this does not arise to deliberate indifference. There is no evidence showing that constitutional violations related to title fraud would be a "highly predictable consequence" of the municipality's failure to provide narrow and specific trainings with regard to title fraud in addition to general auto theft, investigation, and surveillance training. *See Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012). "The occasional negligent administration of an otherwise sound policy is not sufficient to impose municipal liability." *Id.*  Further, Detective Collins allegedly took the steps needed to gain information by contacting the Michigan Secretary of State's office to determine the process for passing title.

It is true Detective Collins testified that he had supervisors but there "was not really any supervision" over his work unless he was doing surveillance or following suspects. [Id]. Minimal supervision, in the absence of a strong likelihood of constitutional violations, does not amount to deliberate indifference. *Gray v. City of Detroit*, 399 F.3d 612, 618 (6th Cir. 2005).

There is no evidence that the either municipality's training or supervision was so flawed and that constitutional violations were so likely that it amounted to deliberate indifference to the constitutional rights of Hart.

Clinton Township and Macomb County are entitled to summary judgment on Count III.

### III.   Conclusion

The Court **DENIES** summary judgment with respect to Detective Collins and **GRANTS** summary judgment with respect to Clinton Township and Macomb County. They are both **DISMISSED** from the case. The only Defendant who remains is Detective Collins.

The Court sets the following dates:

1. Facilitation date: **February 2023**;

2. Settlement Conference before Magistrate Judge: **March 2023**;

3.  Motions in Limine due: **April 3, 2023**;

4.  Final Pretrial Order due: **April 3, 2023**;

5.  Final Pretrial Conference: **April 12, 2023 at 2:00 p.m.;**

6.  Jury Trial: **April 25, 2023 at 9:00 a.m**.

**IT IS SO ORDERED.**

Dated:  December 2, 2022              /s/ Gershwin A. Drain
                                      GERSHWIN A. DRAIN
                                      UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
December 2, 2022, by electronic and/or ordinary mail.
/s/ Teresa McGovern